LAUNDRY SUPPLY CO., Inc., v. COL-
GATE–PALMOLIVE–PEET CO.

No. 6872.

Circuit Court of Appeals, Seventh Circuit.
Jan. 5, 1940.

Rehearing Denied Feb. 5, 1940.

Paul O'Donnell and Russell Whitman, both of Chicago, Ill., Mason Trowbridge, of Jersey City, N. J., and Henry G. Miller, of Chicago, Ill., for appellant.

George S. Lavin, of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

SPARKS, Circuit Judge.

By this action appellee sought to recover from appellant upon an oral contract for commissions. The case was tried before the court without a jury, and upon a finding of the issues favorable to appellee, the judgment was entered from which this appeal is taken.

There is substantial evidence to support the following facts: George H. Bergman was president and treasurer of appellee, the Laundry Supply Company, and acted in its behalf in the transactions here involved. From March, 1934, to October 21, 1935, appellee was the distributor of the products of appellant under certain written contracts. The first was executed in March, 1934. This was superseded by another dated April 23, 1934, which was executed by Bergman in behalf of appellee, and by F. C. Ward as Manager of Industrial Sales for appellant. It provided for the appointment of appellee to market and distribute appellant's products for a commission of 85¢ per hundred weight on all items. It ran for one year from date and was subject to termination after sixty days' notice by either party. On December 14, 1934, the latter contract was modified in writing by the same parties to allow appellee an additional commission of 2½¢ per hundred weight on shipments to certain clubs, and to provide that appellant would invoice all members of these clubs directly.

At the time the first written contract was entered into, the general offices of appellant, and of Ward, were located in Chicago, but shortly thereafter they were moved to Jersey City, New Jersey. Prior to this removal, Bergman visited appellant's general offices in Chicago and there transacted business with Ward and one Burkhardt, the latter holding an inferior office to that of Ward. At one of these visits in Chicago, manager Ward had instructed Burkhardt and Bergman to work together from that time on.

After the general offices were moved to New Jersey, appellee transacted all its business with appellant through Burkhardt. There was correspondence between them, and the letters from Burkhardt to appellee were written on letterheads of appellant, signed by Burkhardt as appellant's Manager, Chicago Industrial Sales, Industrial Territorial Manager, or Chicago Industrial Manager. Appellant also sent telegrams in its name, signed by Burkhardt, to appellee relative to price instructions. During this time Burkhardt also visited Bergman's office frequently and on behalf of appellant informed him of price changes; and all matters with respect to the subject matter of the written contract, including dis-

putes relative to deliveries, were referred to and adjusted by Burkhardt. Subsequently Ward died and A. F. Danz succeeded him as appellant's manager of Industrial Sales throughout the United States, with offices at Jersey City.

Appellee had its place of business in the Union Stock Yards, at Chicago, in a rented building adjacent to a side track on which carload freight destined to appellee was delivered. On August 20, 1935, Danz, in writing [1] notified appellee of appellant's election to terminate the written contract. The cancellation was to be effective on October 21, 1935, and a copy of the notice was sent to Burkhardt at appellant's Chicago office. Within a week after the receipt of this letter, Danz and Burkhardt called at appellee's office and had a conversation with Bergman in which Danz told him that he had done a fine job and that appellant was well satisfied, and that the cancellation was due only to the fact that appellant's competitors had threatened to compete for its coast business if appellant did not terminate its business relations with appellee; that he hoped this situation would clear up and that appellant and appellee would be able to continue their pleasant relations again; and remarked that in the meantime appellee had sufficient soap to supply its customers.

The following week Burkhardt called upon Bergman and told him in substance that he was entirely in accord with the sentiments expressed by Danz the week previously, and that by the time appellee needed more soap the situation would be adjusted and that appellee would again be marketing soap for appellant. He further told Bergman at that time that when he needed soap Bergman should see him; and in answer to Bergman's inquiry as to commissions Burkhardt stated that the matter of commissions would be taken care of.

During all the time referred to herein, there were in existence in the laundry industry in Chicago three groups of laundries known as Midwest Purchasing Club, the A. B. C. Club and the Clean Clothes Club, affiliated for the purpose of purchasing soap and other materials. Bergman had been selling soap to these clubs and the laundry trade generally since 1926, and in behalf of appellant since their first contract in 1934. From August, 1935, to April, 1936, Burkhardt frequently called upon Bergman and discussed with him the importance of Bergman's keeping in contact with these customers. In April, 1936, Bergman informed Burkhardt that appellee needed more soap, to which Burkhardt replied that appellant would provide appellee with a car of soap but the transaction would be secret. Thereupon Burkhardt arranged to have the Benner Chemical Company sell appellee 425 bags of appellant's soap, and this was subsequently received by appellee. Shortly thereafter, Burkhardt called at appellee's office and suggested to Bergman that it was about time for the Clubs to buy soap and that Bergman should begin to solicit orders from them. Burkhardt stated that the sales would be transacted secretly because appellant was still in difficulty with other soap manufacturers; that Bergman should first solicit orders from members of the Clubs and make all arrangements for the purchase of appellant's soap, and Burkhardt would then

---

[1]                    August 20, 1935.
Mr. George Bergman,
Laundry Supply Co., Inc.,
1305 W. 45th Street,
Chicago, Illinois.
My dear Mr. Bergman:
    We have been considering for some time the adoption of some very important changes in our plan of distribution in Cook County for items which have been sold by the Laundry Supply Company, Inc.
    It is now our desire to adopt those plans as soon as possible. Therefore, it is with keen regret that we are obliged to advise you of our election to terminate our agreement with Laundry Supply Company, Inc., such termination to become effective sixty days from date of this letter.
    It is understood that all compensation due the Laundry Supply Company, Inc., upon sales made prior to such termination of said agreement on October 21, 1935, will be credited or paid to the account of the Laundry Supply Company, Inc., in the usual manner.
    We wish to emphasize that this change in our policy of distribution should not be construed as any criticism of your past relations with our company. We have always regarded those relations in the highest esteem on our part. We repeat that we regret any inconvenience that our present decision to change our policy of distribution in Cook County, Illinois may cause you.
        Very truly yours,
            Colgate-Palmolive-Peet Company,
                (Signed) A. F. Danz,
                    Manager, Industrial Sales.

call upon the club members and write the orders so that the purchases would appear to be directly with appellant. Thereupon Bergman asked about appellee's commissions, to which Burkhardt replied that appellee would receive its commissions and appellant would take care of them, and that appellee should sell every bag of soap possible and not permit any sales to be lost.

Burkhardt further told Bergman that the price of soap would be increased on a certain date and advised him to obtain the club orders before that time, whereupon Bergman spoke to many of the men in the Clubs, both purchasing men and other men of influence, and it was arranged in advance that the orders were to be taken by Burkhardt after Bergman told him the number of bags of soap the Clubs desired to purchase. After obtaining the soap requirements from the members of the Clubs, Bergman at his office gave Burkhardt a list from which Burkhardt copied the orders to be signed by the customers, and a record of the same was made on appellee's books.

Thereafter, on or about June 20, 1936, at appellee's office, Burkhardt stated to Bergman that some laundries would not purchase appellant's soap unless appellee would store the soap in its warehouse and deliver the same as they needed it. Thereupon Bergman agreed to store the soap in appellee's warehouse and to deliver the same to the laundries. Burkhardt further told Bergman that he would have as many laundries as possible take the soap direct-ly, and he later informed Bergman which laundries were to have the soap delivered directly, whereupon Bergman made a written memorandum of the direct deliveries and had the same entered upon his records.

About the same time, Bergman had another conversation with Burkhardt after the Midwest Club and the Clean Clothes Club had given their orders to Burkhardt, and after Bergman had secured an order of the soap the A. B. C. Club desired to purchase, of which order he had informed Burkhardt. Burkhardt then told Bergman that he had bad news from the East to the effect that appellant was afraid of its competitors and would not pay appellee's commissions. Thereupon Bergman told Burkhardt that he would insist upon the payment of the commissions to appellee on the soap that it sold; that the club members favored him with orders and that appellee was selling the A. B. C. Club all of its soap requirements, and was selling individual members of other clubs part of their requirements. Thereafter, appellee made deliveries of appellant's soap, which had been stored with it, the first being on or about August 15, 1936, and the remainder thereof during 1936 and 1937. On September 16, 1936, appellee through Bergman wrote a letter to appellant[2] relative to the payment of a commission. Then followed other correspondence between the parties which it is not necessary to set forth. It is sufficient to say the parties came to no agreement and no commissions were paid.

---

[2]                        September 16, 1936.
Mr. A. F. Danz,
Colgate-Palmolive-Peet Co.,
105 Hudson Street,
Jersey City, N. J.
Dear Mr. Danz:

On August 20th, 1935, I received a letter from you stating that our agreement allowing me $87\frac{1}{2}$¢ commission on all club contracts and 85¢ on other sales, would be terminated October 21st. You subsequently came into my office and in the presence of my secretary and your Mr. Burkhardt, you informed me that you wanted me to understand that it was thru no fault of yours but thru the pressure of your competitors, particularly Proctor & Gamble, who had threatened to destroy your Coast business if I was not let go.

Due to the fact that I felt I was not financially able to fight concerns like Proctor & Gamble et al., I resigned myself to my fate. When the club business came up again, your Mr. Burkhardt came to me and told me that as he knew only I could get that business, he wanted me to go out and get it for the Colgate-Palmolive Company and he would see about getting me my commission. The day previous to the contract being let, he informed me that he had been in touch with you and due to your fear of these other companies, it was impossible for you to do anything and there would be no commissions and in view of the fact that Proctor & Gamble and Swift & Company were fighting me and demanded my scalp, it was up to me to turn the business over to you, which I did. I have taken this soap into my warehouse and have to deliver it to the customers as they would not buy unless I stored it.

If Mr. Burkhardt's statement as to why your company cannot pay me my commission is correct, I would like to be so informed as otherwise I am entitled to my commission.

Also, on the last club sale, the market

As a result of the transactions set forth subsequent to August 20, 1935, appellee solicited orders from the laundry clubs and other laundries in Chicago, on behalf of appellant for 6104 bags of appellant's bulk soap, each bag weighing 110 pounds, which orders were accepted and delivered by appellants, of which 3344 bags were shipped directly to the customers and 2760 bags were shipped to appellee's warehouse where they were stored by appellee for future delivery to the various members of the laundry clubs as they might need them, and these bags so stored by appellee were afterwards delivered by it to the various members of the laundry clubs according to their orders.

It is contended by appellant that neither Danz nor Burkhardt had authority to make an oral contract constituting appellee as a broker or salesman for appellant, and it calls to our attention the three prior written contracts on the same subject matter which were executed for appellant by some person other than Burkhardt, the cancellation of which was required to be in writing; and that they were cancelled by an instrument in writing which was executed by someone other than Burkhardt. The execution and cancellation of these written contracts are admitted. However, appellant's contention seems to assume that because they were in writing and were cancelled according to its terms, an oral contract could not have been made between the parties.

We think this assumption is erroneous. We know of no reason why appellant could not be bound by its oral agreements, although such a contract might be contrary to its general practice. The question here presented is whether an oral contract was actually made between these parties. From this record it is clear that Danz and Burkhardt desired to continue the benefits to appellant which flowed to it from the written contract. This could not be openly done on account of the pressure from its competitors, and it could not be done secretly unless the deliveries which had theretofore been made to appellee under the written contracts were made direct-ly to the consumers, and there is substantial evidence in this record to show that this is precisely what was agreed to and done. It was not in accordance with its agreement with its competitors, but if it chose to make a secret contract with Bergman in violation of the agreement with its competitors, it certainly could not refuse to perform its part of its agreement with Bergman after he had fully performed his part.

The vital question before us is whether Danz and Burkhardt, or either of them, was authorized to make the oral contract. Appellant contends that neither had authority to make such contract for it either orally or by writing. From this record it would seem clear that Danz had such right because the written contracts which were cancelled were executed for appellant by Danz' predecessor who had died, and Danz was the one who cancelled them.

It is not claimed that Danz had any less authority than his predecessor, and we think that he at least had apparent authority because appellant fully carried out and approved the contracts which the predecessor of Danz had entered into. It is not claimed that Danz made the oral contract upon which this suit is based, but his words and actions immediately prior thereto are entitled to weight in determining whether or not Burkhardt was acting within the scope of his real or apparent authority. Shortly after the cancellation of the written contracts he came to Chicago to see Bergman, and he brought Burkhardt with him to Bergman's office, and in his presence expressed his great appreciation of the services which appellee had rendered, and expressed a hopeful belief that he would soon be restored to his former status with appellant. Shortly thereafter Burkhardt, who was appellant's highest employee in the Chicago area, came to Bergman's office and fully endorsed what Danz had previously said. He made frequent visits to Bergman's office where the conversations occurred which we have heretofore related. He was appellant's only employee in Chicago with whom appellee could deal, and he was told to work with

was dropping and the soap was sold at 7¢. As you stated 7⅜¢ was your limit, I had to refund ⅜¢ to the clubs. As your price was the same as the others and as you immediately came out with your price list of 7¢, I feel that I am also entitled to this ⅜¢ of a cent on this sale.

Yours very truly,
(Signed) Geo. H. Bergman
Laundry Supply Co. Inc.

him by Danz' predecessor. This, of course, was under the written contracts, but under the circumstances here presented we think it is fair to assume that Burkhardt had as much authority to act for the company after the cancellation of the contracts as before. At least Bergman was never notified to the contrary.

■ Of course, any officer of a corporation is required to act within the scope of his authority, but that scope may be either real or apparent, and if from the consideration of all the circumstances of any particular case it is reasonably apparent that the agent's authority is of such latitude as to warrant his acts, it will be so considered, and his employer will be bound by them. We think the facts in this case warranted the District Court in finding that the oral contract was entered into by Burkhardt with apparent authority from appellant. The details were not specifically mentioned because it is clear that they intended that appellee should perform the same services and receive the same commissions as under the written contract which had been cancelled. Bergman was told that it was a secret agreement, and that fact no doubt accounts for not reducing it to writing and also for not thereafter billing any of the products directly to appellee. It is true that this conclusion is based on many circumstances, but they speak as loudly as a written instrument could, especially when it was to the advantage of appellant that the terms were not reduced to writing. Moreover, this conclusion is strongly fortified by the fact that appellant received the same services of appellee as it had under the written contracts and for which it had paid the same amount of compensation which appellee now asks.

Appellant contends that Bergman's letter of September 16, conclusively shows that Burkhardt had not definitely assured appellee that it would receive its commissions, and that subsequently Burkhardt informed Bergman that appellant could not pay the commissions. This letter is not the only evidence bearing on this subject. In August, 1935, and in May and June, 1936, Burkhardt had definitely assured appellee that its commissions would be paid, and insisted that Bergman see his customers, not for the purpose of taking their orders, but that Burkhardt might take the orders after Bergman had seen them. Obviously this was for the purpose of proving to others who might be interested that appellant had directly secured the business. This work was done by appellee and a list of the customers was given by it to Burkhardt and he afterwards made the sales.

From a consideration of all these facts, it is obvious that appellee did not intend to perform the services required of it by Burkhardt without pay, and it is just as clear that appellant did not have the impression that appellee was doing it without hope of reward. This conclusion is further supported by the fact that Burkhardt subsequently said he received the orders and found some who were unwilling to take the amount they desired to order on account of lack of storage facilities. Burkhardt thereupon reported this fact to appellee and asked for permission to store it in appellee's warehouse for future delivery by appellee to those customers. This was consented to and the services were performed by appellee. It is unreasonable to believe that either of the parties to this controversy then intended that appellee should submit to this expenditure of time and money without compensation.

It is further contended by appellant that even if it is found that Burkhardt had authority to and did reinstate the cancelled written contract, yet appellee would not be entitled to recover in this action because by the terms of that written contract it was to buy and pay for all soap and to resell the same at its own risk as to credit and payment, which requirements appellant insists are not substantiated by the evidence. It is obvious, as stated above, that the oral contract did not require every specific item of the written contract to be complied with. If the secrecy which Burkhardt desired was to be regarded, it was quite necessary that some things should be omitted from the written contract, most notable of which was the fact that they were selling any product to appellee and the fact that it was paying for any part of it. In justice to appellee, we cannot conclude from this evidence that appellee intended it to be otherwise. None of the product was billed to appellee, and we cannot say from this evidence that appellant intended that it should pay for it. Furthermore, this record does not disclose that any of the real purchasers had failed to pay for that which they received. Appellant further contends that the record does not disclose that the sales of the product in question were made

through appellee's efforts or that they had been delivered. There is substantial evidence in this record to establish the contrary. We think the court's finding in this respect was fully warranted.

Judgment affirmed.